AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

District of Delaware

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>Two Cell Phones In the Custody of DEA, Described More<br>Particularly In Attachment A | )<br>)<br>)    Case No. 22-36 M<br>)<br>) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ District of _____ Delaware _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Possession with Intent to Distribute a Controlled Substance |

The application is based on these facts:
see attached affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Christopher Thiel*

*Applicant's signature*

SA Christopher Thiel, DEA

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ telephone _____ *(specify reliable electronic means)*.

Date: ___01/31/2022___

*Judge's signature*

City and state:  Wilmington, Delaware

Honorable Mary Pat Thynge, Chief U.S. Magistrate Judge

*Printed name and title*

*Confirmed applicant's*
*signature and identity*
*on 1/31/2022*

FILED

JAN 3 1 2022

U.S. DISTRICT COURT DISTRICT OF DELAWARE

## IN THE UNITED STATES DISTRICT COURT
## FOR DISTRICT OF DELAWARE

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF:** | |
| | Case No. |
| Two (2) cell phones, in DEA custody, described more particularly in Attachment A. | |

### AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

Your affiant, Christopher M. Thiel, Special Agent ("SA") with the Drug Enforcement Administration ("DEA"), being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property – two electronic devices (cell phones) described with specificity herein and in Attachment A, incorporated herein – which are currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2. I am investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7) and Federal Rule of Criminal Procedure 41, and am empowered by law to conduct investigations of, and to make arrests for, offenses in Titles 18 and 21 of the United States Code. I am presently employed as a Special Agent for the Drug Enforcement Administration (DEA).

3. I have been a Special Agent with the DEA for approximately two (2) years. I attended the new agent training program at the DEA Academy in Quantico, Virginia. I have received on-the-job training in narcotics trafficking, conspiracy, and distribution investigations. I have participated in certain aspects of drug investigations, including the use of confidential

sources and undercover officers, physical surveillance, electronic surveillance, the execution of search and arrest warrants, the use of court-ordered intercepts of wire communications and investigative interviews.

4.      I am familiar with federal drug statues and the methods employed by those who perpetuate these acts. I know cell phones are used by victims and suspects before, during, and after criminal events is helpful in investigations of the same. In addition to my own training and experience, I have consulted with other experienced agents and officers and relied on their training and experience in forming some of the conclusions in this affidavit.

5.      During my time in law enforcement, and through training and experience, I have become familiar with the manner and methods by which narcotics traffickers conduct their illegal business and common language and terms that are used to disguise conversations about their narcotics activities. Your affiant also recognizes that narcotics traffickers utilize cellular telephones and/or portable cellular telephones to conduct drug activity, and that they frequently change their cellular devices and/or cellular telephone numbers to avoid law enforcement detection.

6.      The investigation concerns alleged violations of distribution of a controlled substance, in violation of 21 U.S.C. § 841(a)(1) and 841(b)(1)(A), (hereinafter referred to as the "SPECIFIED FEDERAL OFFENSES").

7.      The facts in this affidavit come from my personal observations, my training and experience and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

2

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

8.      This affidavit is in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 for the following listed cellular telephone equipment seized by officers of the Delaware State Police ("DSP") on January 20, 2022, when Guadalupe TORRES was arrested:

> a. A Black Verizon Kyocera flip cell phone bearing unknown telephone number, (hereinafter "TARGET DEVICE #1"); and
>
> b. A black and blue ONEPLUS cell phone bearing unknown telephone number, IMEI: # 990016830169213 (hereinafter "TARGET DEVICE #2")

9.      Together, these devices are referred to as the "TARGET DEVICES" and are described in Attachment A. The TARGET DEVICES are currently located at the DEA Dover Post of Duty, located at 1012 College Road, Suite 205, Dover, DE 19904. They came into your affiant's custody after DSP officers seized them.

10.     In my training and experience, I know that the TARGET DEVICES have been stored in a manner in which their contents are, to the extent material to this investigation, in substantially the same state as they were when the TARGET DEVICES first came into possession of DEA.

11.     The requested warrant would authorize the forensic examination of the TARGET DEVICES for the purpose of identifying electronically stored data particularly described in Attachment B.

12.     Your affiant submits, based on the information set forth in this Affidavit, that there is probable cause to believe that the TARGET DEVICES contain evidence of violations of one or more of the SPECIFIED FEDERAL OFFENSES.

3

**PROBABLE CAUSE**

13.    The United States, including the Drug Enforcement Administration, is conducting a criminal investigation of Guadalupe TORRES ("TORRES").  As set forth herein, based on information obtained from your affiant, an Undercover Officer ("UC"), and the observations of other agents and officers, TORRES was actively distributing significant quantities of methamphetamine throughout Sussex County, Delaware, until his arrest on January 20, 2022, pursuant to the criminal complaint and arrest warrant issued by this Court in Case No. 22-23M.   Specifically, the UC has purchased approximately two pounds of methamphetamine from TORRES and law enforcement has seized approximately one pound of methamphetamine that TORRES mailed to a law enforcement-controlled address.

14.    Beginning in December 2020, the UC purchased methamphetamine from Porfirio Jimenez-Arizmendi, who investigators believe was getting his drugs from TORRES.

15.    On December 15, 2020, and January 14, 2021, the UC made separate purchases of one ounce of methamphetamine from Jimenez-Arizmendi for a total of $2,200. The drugs filed tested positive.

16.    On February 18, 2021, the UC purchased 273 grams of methamphetamine from Jimenez-Arizmendi for $7,000.   (The drugs were analyzed by a DEA Lab, which identified them as methamphetamine.)   Jimenez-Arizmendi  told the UC that the UC could purchase large amount of methamphetamine from TORRES and later introduced the UC to TORRES.

17.    On March 4, 2021, TORRES met with the UC in Lincoln, Delaware to discuss future methamphetamine transactions. TORRES told the UC that he could sell the UC pounds of methamphetamine for approximately $8,000 per pound.

18.    TORRES told the UC that when he has the methamphetamine and/or when it is shipped, the methamphetamine is concealed in a special box that can hide it from drug-detecting canines. TORRES told the UC that he receives shipments of methamphetamine from his family in California. TORRES stated that the methamphetamine is shipped to an address that is carefully

4

monitored by TORRES's associates until the package can be picked up. TORRES explained that he constantly receives updates on the location of each package he has sent.

19. TORRES also told the UC that he, TORRES, conducts his business in a very particular way. If he has any issues, he can have paid assassins come from Mexico to the United States to murder anyone he wants to have killed.

20. On March 13, 2021, TORRES contacted the UC on telephone and asked to meet in Lincoln, Delaware. TORRES sold the UC approximately ten ounces of methamphetamine for $5,000 and "fronted" (provided before payment) the UC approximately six additional ounces of methamphetamine.

21. During this meeting, TORRES also told the UC that his, TORRES', shipments of methamphetamine are sent to Wilmington, Delaware and Pennsylvania. TORRES told the UC that if the UC had an address to use, TORRES could send the UC multiple pound shipments of methamphetamine.

22. On March 30, 2021, the UC contacted TORRES by telephone to schedule a meeting in order to repay TORRES $3,000 for the six ounces of methamphetamine that TORRES fronted the UC on March 15.

23. At the subsequent in-person meeting with the UC, TORRES accepted the $3,000 payment from the UC for the prior drug debt and agreed to coordinate with the UC for future deliveries of methamphetamine.

24. On April 29, 2021, TORRES met the UC so that the UC could provide TORRES $4,000 as a prepayment to receive a shipment of methamphetamine. TORRES agreed to have the shipment of methamphetamine sent via UPS to an agreed upon location.

5

25.     In addition to the methamphetamine for the UC, TORRES also planned to send methamphetamine for TORRES to the same address. TORRES agreed to the UC paying for the rest of the methamphetamine at a later date.

26.     Your affiant, along with other law enforcement, was able to track a UPS package sent from the Fresno area of California to the shipping location agreed on by the UC and TORRES to send the package of methamphetamine.

27.     The package was searched pursuant to a search warrant signed on May 7, 2021 (No. 21-152M). Inside the parcel was roughly one pound of crystal methamphetamine hidden inside several layers of packaging.

28.     Tracking information on the parcel continued to show that it was on its way to the intended destination, despite it having been seized by law enforcement.

29.     The UC and TORRES had several conversations regarding the parcel. On May 7, 2021, TORRES sent a screenshot of the tracking information to the UC, indicating that it was still in route. Ultimately, UPS marked the package as lost.

30.     After the "failed" shipment, the UC and TORRES began to discuss a second shipment of methamphetamine to recompense the UC for the $4,000 the UC had already paid. On May 18, 2021, TORRES told the UC he would speak with his contacts in California about shipping a replacement package with two pounds of methamphetamine. TORRES said he would let the UC know when the package was scheduled to arrive.

31.     On June 4, 2021, TORRES contacted the UC telephonically to meet in Millsboro, Delaware.   At that meeting, TORRES provided the UC with approximately one pound of methamphetamine. The UC paid TORRES half of the total amount owed, $4,000.

6

32.    On June 16, 2021, TORRES contacted the UC telephonically to meet him in Millsboro, Delaware.  The UC met with TORRES and paid him the remaining $4,000 the UC owed TORRES for the pound of methamphetamine purchased on June 4, 2021.

33.    TORRES and the UC discussed a future deal and TORRES agreed to provide the UC with several pounds of methamphetamine at a later date.

34.    On July 7, 2021, the UC and TORRES spoke telephonically in order to discuss a future purchase of methamphetamine.  TORRES told the UC that he had to sell the two pounds of methamphetamine he had on hand before he could receive any more methamphetamine.  TORRES told the UC he would sell the first pound as a whole pound and the second one in ounce quantities. TORRES said he would be able to order multiple pounds of methamphetamine for the UC once he sold the two pounds.

35.    On July 22, 2021, TORRES contacted the UC telephonically and told the UC that he currently had one pound of methamphetamine and had the ability to get two to three more pounds of methamphetamine.    The UC stated that TORRES referred to the pounds of methamphetamine as "books."  The UC asked to buy three pounds from TORRES and TORRES indicated that he would get the three pounds together and contact the UC when it was ready. On July 23, 2021, the UC spoke with TORRES, and they discussed the deal.  TORRES indicated that he would be able to sell the UC two pounds of methamphetamine.

36.    On October 29, 2021, a DEA Confidential Source (CS) met with TORRES  to purchase one ounce of methamphetamine.  TORRES sold the DEA CS approximately one ounce of methamphetamine for $800.00.  During the meeting TORRES told the DEA CS to contact him if the DEA CS needs anymore methamphetamine and he would be able to provide it for the

7

DEA CS. Later, on January 20, when TORRES was arrested, investigators seized from his person the two phones described in Attachment A.

37.     Based on your affiant's training and experience, he knows that drug traffickers utilize cellular telephones to coordinate their transactions, including details regarding the quantity and type of illegal drug and the physical meet location of the transaction. This is commonly done through text messages and telephone calls. Persons involved in criminal acts will utilize mobile electronic devices, such as cellular phones, to further facilitate their criminal acts and/or communicate with customers and co-conspirators. Drug traffickers also commonly utilize their cell phones to take photographs and store images of drugs, drug proceeds, guns and associates, sometimes to promote their business via the use of social media.

38.     There is probable cause to believe that TORRES has used the two TARGET DEVICES to further narcotics trafficking. Based upon your affiant's training and experience narcotics traffickers carry multiple phones, at least one reserved for family and personal matters and a second for drug dealing and communicating with sources of supply, customers and co-conspirators. TORRES' narcotics trafficking most likely was facilitated by the TARGET DEVICES and therefore the forensic extraction of the TARGET DEVICES will likely uncover conversations and other evidence that shows to TORRES's involvement in narcotics distribution, specifically identifying TORRES's co-conspirators, suppliers, and customers, and any locations where he may store drugs.

## TECHNICAL TERMS

39.     Based on my training and experience, I use the following technical terms to convey the following meanings:

      a. Wireless telephone:   A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

      b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also

9

include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna

10

can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.  PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the Target Device.

f.  IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

11

g. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

40.    Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications available online at http://Apple.com/us/, and http://LG.com/us/. I know that each TARGET DEVICE is a smart phone and has capabilities that allow it to serve as "a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA." In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the TARGET DEVICES, as well as evidence related to crimes committed or facilitated by them.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

41.    Based on my knowledge, training, and experience, I know that electronic devices, such as smart phones, can store information for long periods of time, including information that has been viewed via the Internet. This information can sometimes be recovered with forensics tools.

42.    *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Target Devices were used, the purpose of that use, who used them, and when. There is

12

probable cause to believe that this forensic electronic evidence might be on the Target Devices because:

  a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

  b.  Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

  c.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

  d.  The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

f.  I know that when an individual uses an electronic device to facilitate drug trafficking, the individual's electronic device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The electronic device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The electronic device is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that an electronic device used to commit a crime of this type may contain: data that is evidence of how the electronic device was used; data that was sent or received; and other records that indicate the nature of the offense.

43.  *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the Target Devices consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the Target Devices to human inspection in order to determine whether it is evidence described by the warrant.

44.  *Manner of execution.* Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto any premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

45.     Based on the foregoing, your affiant respectfully submits that there is probable cause to believe that there exists evidence of violations of the SPECIFIED FEDERAL OFFENSES on the TARGET DEVICES.  Accordingly, your affiant respectfully requests that this Court issue a warrant to search the TARGET DEVICES, more particularly described in Attachment A, and to seize the items specified in Attachment B.

Respectfully submitted,

*Christopher Thiel*

Christopher M. Thiel
Special Agent
Drug Enforcement Administration

Subscribed and sworn by telephone
on January _31_ , 2022.

HONORABLE MARY PAT THYNGE
UNITED STATES MAGISTRATE JUDGE

15

**ATTACHMENT A**

The property to be searched is:

- A Black Verizon Kyocera flip cell phone bearing unknown telephone number,



  (hereinafter "TARGET DEVICE #1"); and

- A black and blue ONEPLUS cell phone bearing unknown telephone number,



  IMEI: # 990016830169213, (hereinafter "TARGET DEVICE #2")

Both cell phones, collectively the (TARGET DEVICES), are currently located at the DEA

Dover Post of Duty, located at 1012 College Road, Suite 205, Dover, DE 19904.

**ATTACHMENT B**

1.      All records on the TARGET DEVICES, described in Attachment A, that relate to violations of 21 U.S.C. § 841(a)(1), Possession with Intent to Distribute a Controlled Substance, which records are for the period January 1, 2020, through January 20, 2022, and involve Guadalupe TORRES, Porfirio Jimenez-Arizmende, and others, regardless of the application used to create, store, or share same, including:

   a. Text messages or instant messages, sent or received;

   b. Voice mail messages, sent or received;

   c. Images, pictures, photographs, videos, or other visual depictions, sent or received;

   d. Electronic calendars, notes, task lists, or other information relating to a person's activities;

   e. Names, telephone number, and addresses, including but not limited to the Address Book;

   f. Bank and credit card account information, and other financial records;

   g. GPS and location data; and

   h. Evidence of user attribution, showing who used or owned the TARGET DEVICES at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.